1  DEAN M. CONWAY
   *(counsel for service)*
2  SARRA CHO
   CHRISTOPHER NEE
3  Email:  conwayd@sec.gov

4
   Attorneys for Plaintiff
5  Securities and Exchange Commission
   100 F Street NE
6  Washington, DC 20549
   Telephone: (202) 551-4412
7  Facsimile: (202) 772-9245

8

9                **UNITED STATES DISTRICT COURT**

10               **EASTERN DISTRICT OF CALIFORNIA**

11

12  SECURITIES AND EXCHANGE           Case No.
    COMMISSION,
13                                     **COMPLAINT**
                Plaintiff,
14
        vs.
15
    JEFFREY P. CARPOFF and
16  PAULETTE CARPOFF,

17              Defendants.

18

19  **JURY  DEMAND**

20  Plaintiff, the United States Securities and Exchange Commission ("SEC" or

21  "Commission"), for its Complaint alleges as follows:

22                    **JURISDICTION AND VENUE**

23        1.    The Court has jurisdiction over this action pursuant to Sections 20(b),

24  20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

25  §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of

26  the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

27  78u(d)(3)(A), 78u(e) & 78aa(a).

28        2.    Defendants have, directly or indirectly, made use of the means or

COMPLAINT                              1

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  Defendants committed many of the acts set forth in this Complaint in this district.  For example, the Carpoffs maintained offices at DC Solar Solutions, Inc. and initiated wire and bank transfers and sent emails from their office computers at DC Solar Solutions, Inc., which is located in this district.

## SUMMARY

4.     This case involves fraudulent securities offerings and a massive Ponzi scheme that raked in over $910 million in investor funds.  This Ponzi scheme was orchestrated by husband and wife Defendants Jeffrey ("Jeff") and Paulette Carpoff through companies they controlled, and which they used to enrich themselves at investors' expense.

5.     The Carpoffs offered and sold investment opportunities through two solar energy companies in the business of making, leasing, and operating mobile solar generators ("Generators").  The Carpoffs and others touted these investment opportunities would deliver gains in the form of tax benefits, guaranteed lease payments, and the resulting profits from the operation of the Generators.  In reality, thousands of the purportedly profitable Generators were never even manufactured, let alone put into use, and the vast majority of alleged "revenue" sent to investors came from investor money, not from actual lease payments from end-users of the Generators.

6.     In 2011, the Defendants began selling investment contracts through their privately held alternative energy companies DC Solar Solutions, Inc. ("DC

Solutions") and DC Solar Distribution, Inc. ("DC Distribution) (collectively with Jeff and Paulette Carpoff "DC Solar").  Through December 2018, DC Solar raised around $910 million from purchasers of the investment contracts.  DC Solar designed the investments to take advantage of tax credits that were available to certain alternative energy related projects.  To that end, investors purchased Generators from DC Solutions and then immediately leased them to DC Distribution.  DC Distribution was then supposed to sub-lease the Generators to end-users.  DC Solar touted itself as a major player in its industry, with thousands of Generators in the field, lucrative contracts with big customers yielding a track record of consistent revenue, and extensive experience in making and maintaining the Generators and finding customers for them.

7.      That was all a sham.  DC Solar had manufactured and put into service far fewer Generators than it claimed, and made hardly any of its revenue from leasing Generators to end-users.  In fact, DC Solutions did not actually manufacture nearly two-thirds of the Generators that it purportedly sold to investors.  Recent intensive efforts by investors to locate the Generators have identified less than 6,600 of the approximately 17,600 Generators for which DC Solar entered into investment contracts and sold to investors.  Investors paid hundreds of millions of dollars for Generators that never existed.  And, legitimate lease income from actual end-users of the Generators represented a tiny fraction -- less than 5% -- of DC Distribution's revenue.  The vast majority of DC Distribution's revenue was comprised of investor funds transferred from DC Solutions.  In reality, the vast majority of investor funds was not being used to manufacture, place into service, and maintain the thousands of Generators that DC Solar was using as the basis for investment contracts, but was instead being pilfered by Defendants Jeff and Paulette Carpoff for their personal benefit, such as the purchase of luxury vehicles, private jet services and real estate, and used to make lease payments and distributions to earlier investors.

8.      Defendants' other claims designed to lure investors were false.  DC

Solar was not a major player in the industry.  There were no lucrative contracts with big customers.  And DC Solar did not have extensive experience finding customers for its Generators.

9. The Defendant Carpoffs were the architects and the chief beneficiaries of this fraudulent scheme.  Jeff and Paulette Carpoff each knowingly hid, and oversaw others in hiding, from investors that DC Solutions had not manufactured their Generators and that DC Distribution generated minimal amounts of legitimate lease revenue.  They did so by committing and/or overseeing a variety of deceptive acts including making false statements in investment contracts with investors, funneling investor funds through DC Solutions to DC Distribution to pay earlier investors, causing the creation of bogus commissioning reports for the Generators, directing that false financial statements be prepared for DC Solutions and DC Distribution, and creating and touting fraudulent leasing arrangements with end-users of the Generators.

10. As a result of the conduct alleged herein, Defendants have violated the antifraud provisions of the Securities Act and the Exchange Act.  The SEC brings this action and seeks entry of permanent injunctions against Defendants as well as disgorgement of ill-gotten gains and prejudgment interest thereon and civil money penalties.

## **THE DEFENDANTS**

11. Jeffrey P. Carpoff was a resident of Martinez, CA during the relevant time period.  In addition to owning DC Solutions, Jeff Carpoff was the President and a Director of DC Solutions and the Vice President and a Director of DC Distribution.

12. Paulette Carpoff was a resident of Martinez, CA during the relevant time period.  In addition to owning DC Distribution, Paulette Carpoff was the President, Secretary, Treasurer, and a Director of DC Distribution and the Secretary, Treasurer and a Director of DC Solutions.

## RELATED INDIVIDUALS AND ENTITIES

13.     DC Solar Solutions, Inc. is a California corporation headquartered in Benicia, CA.  It was owned by Jeff Carpoff.  DC Solutions is not registered with the SEC in any capacity.  It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

14.     DC Solar Distribution, Inc. is a California corporation headquartered in Benicia, CA.  It was owned by Paulette Carpoff.  DC Distribution is not registered with the SEC in any capacity.  It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

15.     Joseph W. Bayliss is a resident of Martinez, CA.  Bayliss is the owner of Bayliss Innovative Services, Inc. through which he is licensed as an electrical and general building contractor.

16.     Robert A. Karmann is a resident of Clayton, CA.  He was the CFO and prior to that, the Controller, of DC Solutions from late 2014 through 2018.  As DC Distribution did not have its own CFO and was closely affiliated with DC Solutions, Karmann performed essentially the same CFO duties for DC Distribution as well.  He is licensed as a Certified Public Accountant in California.

17.     Ronald J. Roach is a resident of Walnut Creek, California.  Roach was a certified public accountant and the owner of Ronald J. Roach Accountancy Corporation.  He has held Series 6, 7, 63 and 65 securities licenses and was a registered investment adviser and a registered representative.

## FACTUAL ALLEGATIONS

### A.     Background on DC Solar

18.     Jeff and Paulette Carpoff were the owners and principals of DC Solutions and DC Distribution.  While DC Solutions and DC Distribution are two separate legal entities, they operated from the same location and shared the same management and employees.  DC Solar told investors that it "design[ed], manufacture[d] and lease[d] renewable energy products to serve the off-grid needs of

a broad and diverse marketplace – while providing investors with access to the renewable energy asset class."

**B.     The DC Solar Securities Offerings**

       **(1)     The Solicitation of Investors**

19.     Since at least 2011 and continuing to December 2018, DC Solar offered securities to investors.  The securities took the form of two types of investment contracts: (1) Investment Fund Contracts and (2) Sale-Leaseback Contracts.  Under both arrangements, the investors paid to purchase Generators from DC Solutions, while simultaneously leasing them to DC Distribution.  DC Distribution would then purportedly arrange to sub-lease the Generators to end-users.  The investors expected to profit from the investments due to tax credits, depreciation on the Generators, and lease payments.  Investors thus played an entirely passive role:  the success of the venture, and thus the profits to investors and DC Solar, turned entirely on the efforts of DC Solar to make, maintain, market, and lease the Generators.

20.     Over the course of the offerings, DC Solar raised approximately $910 million in investor money.  These deals had face values of more than $2.7 billion because investors in the Investment Fund Contracts financed approximately 70 percent of the amount of their investments through promissory notes.

21.     DC Solar, directly and indirectly, solicited investors through brokers and salespeople using various methods, including email, conference calls and in-person meetings.  DC Solar offered and sold Investment Fund Contracts and Sale-Leaseback Contracts through interstate commerce to investors throughout the United States.

22.     DC Solar marketed itself as having extensive experience and capabilities in the renewable energy field and in executing successful transactions for investors. For example, pitch-books for investors, which were prepared by a broker working on behalf of DC Solar using information provided by DC Solar, emphasized that DC Solar had thousands of Generators deployed and manufacturing capabilities of 900 Generators per month.  They also highlighted that DC Solar had closed many prior

investment funds with "headline" or "notable" investors, including funds with fair market values near or over $100 million, and that the "performance of each of the funds remains in good standing."  In addition, the materials falsely claimed that DC Solar had "customer relationships with leading companies in the telecommunications, entertainment and construction industries" and provided case studies of the established leasing arrangements with many of those customers.  Finally, certain of the pitch-books provided a "Summary of Investor Returns" with estimated internal rates of return ranging from 40 to as high as 50 percent.

### (2)     The Terms of the Investment Fund Contract Offerings

23.     Investment Fund Contract investors executed a standard package of agreements, including:  (i) a Limited Liability Company Agreement ("LLC Agreement"); (ii) a Solar Equipment Purchase Agreement ("Purchase Agreement"); (iii) a Secured Promissory Note ("Promissory Note"); and (iv) a Mobile Solar Equipment Lease ("Equipment Lease") (together the "Investment Fund Contracts").  The documents were executed at or around the same time, with Jeff Carpoff signing the Purchase Agreements on behalf of DC Solutions and Paulette Carpoff typically signing the Equipment Leases on behalf of DC Distribution.  While the Investment Fund Contracts for certain deals had variations, they largely had the same substantive terms.

24.     Under the terms of the LLC Agreement, an investor became the "Investor Member" of the Investment Fund Limited Liability Company ("Investment Fund"), an entity created specifically for the purpose of the investment.  This Investment Fund then purchased Generators from DC Solutions at a price of $150,000 per Generator under the Solar Equipment Purchase Agreement.  The Purchase Agreement specified the total number of Generators being purchased as well as the total purchase price.  An Exhibit to the Purchase Agreement contained a blank space for the Vehicle Identification Numbers ("VINs") for the Generators or stated that "VIN for each Generator to be Supplied at Delivery."  In exchange for the

payment, DC Solutions agreed to deliver the Generators by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

25.     The delivery dates for tranches of Generators specified in the Purchase Agreements were often scheduled in stages.  Likewise, the Purchase Agreements dictated that payments would be due to DC Solutions in stages according to a schedule in part dictated by capital contributions being made by the investor under the terms of the LLC Agreement.  Those capital contributions were contingent on the investor receiving confirmation that the Generators were "Placed in Service" as evidenced by an "IE [Independent Engineer] Certificate."

26.     Investors generally contributed about thirty percent of the purchase price in cash and financed the balance pursuant to a Promissory Note or Notes executed by the Investment Fund in favor of DC Solutions.  The Promissory Note was an exhibit to the Purchase Agreement.  DC Solar told investors, and arranged for a tax opinion letter from a law firm confirming, that the Generators qualified for the Energy Credit under Internal Revenue Code § 48.  That provision allows for a thirty percent tax credit for certain energy-related investments.  Thus, investors expected to be able to take a tax credit for roughly the same amount as their cash contribution to the investment.

27.     Under the Investment Fund Contracts, the Generator business was entirely managed and operated by DC Solar.  At the time the Investment Funds executed the Purchase Agreement with DC Solutions, the Investment Funds also executed the Mobile Solar Equipment Lease with DC Distribution for at least the first batch of Generators being purchased.  Depending on the size of the transaction, as additional tranches of Generators were manufactured, more Equipment Leases were executed.  Under the Equipment Leases, the Investment Funds leased their Generators to DC Distribution for terms ranging up to 120 months.  The Equipment Leases provided that DC Distribution shall use "the Solar Equipment in a careful and

proper manner" and "shall comply with all laws, regulations and ordinances."

28.     Moreover, the Equipment Leases stated that DC Distribution shall be "solely responsible for the maintenance and repair of the Solar Equipment" and "shall ensure the Solar Equipment is operational and capable of producing solar energy at all times." The Equipment Leases required DC Distribution to "obtain, maintain and keep" insurance coverage on the Generators in the amount of the replacement cost as well as "liability insurance." In addition, the Equipment Leases required DC Distribution to "promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes" related to the Generators.

29.     The Equipment Leases further provided for a set amount of "Base Rent" to be paid to the Investment Fund in advance in monthly installments for the term of the lease as well as payment to the Investment Fund of "Additional Rent" or "Variable Rent" to the extent DC Distribution received revenue from subleasing the Generators in excess of a certain amount. The amount of additional or variable rent due to the Investment Fund varied depending on the deal and the calculation was specified in the Equipment Lease.

30.     The Investment Fund Contracts were structured such that there was a flow of money between the Investment Funds and DC Solar, all of which was contingent on the Generators generating significant sub-lease revenue from legitimate end-users. DC Distribution owed monthly lease payments to the Investment Funds purportedly to be paid with the sub-lease revenue it received from third-party customers. The Investment Funds would then use the lease payments they received from DC Distribution under the terms of the Equipment Leases to make monthly payments due to DC Solutions under the terms of the Promissory Notes. Investors expected several benefits under the arrangement, including the thirty percent energy tax credit and the ability to claim significant depreciation on the Generators.

31.     In addition, investors expected to receive profits in the form of annual

cash distributions from the Investment Funds.  In general, the LLC Agreements stated that "Distributable Cash," defined as the amount of cash from lease revenue remaining after loan payments and operating expenses, would be paid out to investors on an annual basis.  Based on financial projections for the Investment Funds that were provided to investors, investors expected to receive these cash distributions.

32.   From December 2011 through December 2018, DC Solar closed 34 Investment Fund Contracts, involving 13 institutional investors, totaling about $2.57 billion in face value.  The investors made roughly $759 million in cash contributions to their Investment Fund Contracts.

### (3)   The Terms of the Sale-Leaseback Contract Offerings

33.   DC Solar began offering the second type of security, the Sale-Leaseback Contracts, in around 2017.  Investors in the Sale-Leaseback Contracts typically executed several agreements including: (i) a Sale Agreement; (ii) an Equipment Lease Agreement; and (iii) a Schedule (collectively the "Sale-Leaseback Contracts").  Jeff Carpoff typically signed the Sale Agreement on behalf of DC Solutions, or in one instance on behalf of another affiliate of DC Solar, and Paulette Carpoff typically signed the Lease Agreement and the Schedule on behalf of DC Distribution.  While the Sale-Leaseback Contracts for certain deals had minor variations in wording, they largely had the same substantive terms.

34.   The Sale-Leaseback Contracts differed from the Investment Fund Contracts in that investors purchased the Generators outright from DC Solutions, or in one instance another affiliate of DC Solar, without executing a Promissory Note.  Under the Sale Agreement, investors paid $150,000 for each Generator they purchased.  The Generators were identified by VIN in an exhibit attached to that Agreement.  In exchange for the purchase price, DC Solutions agreed to convey to the investors "all right, title and interest in" the Generators.

35.   One Sale-Leaseback Contract transaction differed from the others in that the investor purchased used Generators and paid $82,500 for each.  As the Generators

were used, they did not qualify for the energy tax credit.  However, the investment worked the same as the other Sale-Leaseback Contracts with the investor immediately leasing the Generators to DC Distribution and being entirely reliant on DC Distribution to maintain and sub-lease the Generators.

36.    Just as was done in the Investment Fund Contracts, under the Sale-Leaseback Contracts the investors immediately leased the Generators back to DC Distribution (or another affiliate of the Company) in return for monthly payments purportedly to be made from sub-lease payments.  Under the Lease Agreement, DC Distribution committed to keeping the Generators "in good repair" and operating condition and to "maintain" insurance coverage on the Generators as well as "liability insurance."  The Lease Agreement also required DC Distribution to pay, or reimburse the investor for, all taxes, fees, and assessments imposed on the Generators.

37.    Like the Investment Funds, most investors in the Sale-Leaseback Contracts received an "IE Certificate," or "IE Commissioning Report," for each new Generator that they purchased.

38.    The Schedule to the Lease Agreement set forth the term of the lease and a set lease payment due to the investors from DC Distribution each month.  An attachment to the Schedule again identified the Generators by VIN.  In addition to the monthly lease payments, most Sale-Leaseback Contract investors expected to be able to take the 30 percent energy tax credit as well as depreciation on the Generators they purchased.  In fact, the Schedules in certain of the Sale-Leaseback Contracts specifically referenced the energy tax credit and depreciation and required DC Distribution to use the Generators so as to remain eligible for those tax benefits. Based on the combination of tax benefits and lease revenue, the Sale-Leaseback Contract investors expected to earn a positive return and profit from these transactions.

39.    From 2017 through 2018, DC Solar completed seven Sale-Leaseback Contracts, involving four institutional investors, in transactions worth nearly $151

million.

### (4)   The Company's Offerings Are Securities

40.   DC Solar offered and sold the Investment Fund Contracts and Sale-Leaseback Contracts through interstate commerce to investors located in multiple states.

41.   DC Solar's Investment Fund Contracts and Sale-Leaseback Contracts are securities in the form of investment contracts.  They represented an investment of money, in a common enterprise, with the expectation of profits to be derived from the efforts of a third party.  Investors provided money to DC Solar for investment purposes.  Because the terms of the Investment Fund Contracts and Sale-Leaseback Contracts tied the fortunes of the investors to those of DC Solar and its ability to manufacture the Generators and then sub-lease them to end-users at optimal rates, investors were investing in a common enterprise.  And, because the terms of the Investment Fund Contracts and Sale-Leaseback Contracts made investors entirely dependent on DC Solar to manufacture, operate and maintain their purported Generators, DC Solar's efforts were essential to the success or failure of the common enterprise.  Investors also had an expectation of profits from the tax benefits and payment stream to be generated from the enterprise.

## C.   The Carpoffs Orchestrated and Committed Deceptive Acts in Furtherance of the Fraud

42.   Unbeknownst to investors, DC Solar never manufactured the majority of the Generators that it sold.  And, most of the lease revenue paid to investors consisted of funds from other investors, rather than lease income from legitimate end-users of the Generators.  In an effort to fool investors into believing that DC Solutions had manufactured and delivered all of the Generators that investors purchased and that DC Distribution was earning substantial lease revenue from legitimate end-users, the Carpoffs orchestrated and engaged in a series of lies and deceptive acts.

(1)     **The Carpoffs Sold Non-Existent Generators to Investors through DC Solutions**

43.     Investors paid DC Solutions over $910 million in cash and took on promissory notes to DC Solutions for roughly $1.8 billion for the Generators over the course of the scheme.  However, because DC Distribution continued to fail in its attempts to lease the Generators to legitimate end-users in significant numbers, DC Solutions had virtually ceased production of new Generators on any scale by sometime in 2016.  In fact, recent efforts by investors to locate their Generators turned up only about 6,571 of the over 17,600 Generators that they purportedly purchased.  The overwhelming majority of Generators that DC Solar sold to investors were not manufactured.  Indeed, for eight of the Investment Funds that closed after late 2016 with a total transaction size of nearly $1 billion, ***none*** of the approximately 6,575 Generators they purchased were found.  For another Investment Fund that closed in July 2018, just 90 of the approximately 2,280 Generators it purchased were found.  In total, across all of the Investment Fund Contracts and Sale-Leaseback Contracts, the inventory located only about 37% of the Generators that were sold by DC Solutions.  Thus, investors collectively paid more than $1.6 billion through cash contributions and promissory notes to DC Solutions for non-existent Generators.  The Carpoffs took numerous steps to hide from investors the fact that the Generators had not been manufactured.

a.     ***The Carpoffs Made False Statements to Investors***

44.     After mid to late 2016, when DC Solutions had essentially ceased production of Generators for new Investment Funds, Defendants Jeff and Paulette Carpoff still each continued to fraudulently execute agreements with numerous Investment Funds even though they knew that the terms of the agreements would not be fulfilled and that investors would be duped out of hundreds of millions of dollars. Defendant Jeff Carpoff, as President of DC Solutions, signed Purchase Agreements that falsely promised delivery of Generators by a certain date and falsely warranted

1   that the Generators would "be in working order" and conform to the agreed upon

2   specifications.  Investors made payments to DC Solar based on these false statements.

3       45.    As the President and the owner of DC Solutions, Jeff Carpoff had access

4   to all bank accounts for the company and was the primary person at DC Solutions

5   who dealt with the suppliers and manufacturers of the components for the Generators.

6   When he signed the Purchase Agreements with the Investment Funds after late 2016,

7   Jeff Carpoff knew that DC Solutions had stopped manufacturing Generators on the

8   scale necessary to fulfill its obligations and that the representations he was making to

9   investors were false.

10       46.    Defendant Paulette Carpoff likewise signed agreements intended to fool

11   investors into believing that their investments were legitimate.  As President of DC

12   Distribution, she signed Equipment Leases in which she falsely warranted that the

13   Generators would be operated  "in a careful and proper manner" and that DC

14   Distribution would be "solely responsible for the maintenance and repair" of the

15   Generators.  She also falsely represented that DC Distribution would ensure that the

16   Generators were "operational and capable of producing solar energy at all times."

17       47.    As an officer and director of DC Solutions, Paulette Carpoff had access

18   to the bank records and contracts of the company.  In addition, as the President and

19   owner of DC Distribution, she was aware of the true number of Generators that DC

20   Solutions had delivered to DC Distribution to be sub-leased to end-users and which

21   DC Distribution actually maintained.  By late 2016, Paulette also knew that DC

22   Solutions had stopped manufacturing Generators on a scale necessary to fulfill its

23   obligations.  Notwithstanding these facts, Paulette Carpoff still continued to execute

24   Equipment Leases, which contained false representations concerning how DC

25   Distribution would deploy non-existent Generators.  These lies were told in order to

26   fool investors and perpetuate the scheme.

27       48.    Even prior to late 2016, Paulette Carpoff made misleading statements to

28   investors in the Equipment Leases she signed.  In those Equipment Leases, DC

Distribution committed to paying "Base Rent" as well as "Additional Rent" or "Variable Rent." The Equipment Leases misleadingly omitted that any "Base Rent," "Additional Rent," or "Variable Rent" payments due to investors were contingent on DC Solutions raising money from new investors because DC Distribution was generating virtually no lease revenue from sub-leases with end-users. Paulette Carpoff was aware that DC Distribution was generating minimal amounts of legitimate lease revenue from end-users because as the President and owner of DC Distribution she had unfettered access to the bank accounts, financial records, and sub-lease agreements of the company.

49.     Information about the existence of the Generators and the amount of lease revenue being generated by DC Distribution was critical to investors. Had investors known that the Generators they purchased would not be manufactured or that their lease payments depended on new investors putting money into the scheme, they would not have invested.

### b.     *Jeff Carpoff Arranged for False Certifications for Investors*

50.     By design, investors never physically took possession of the Generators that they purchased because the Generators were immediately leased to DC Distribution upon purportedly being placed in service. Pursuant to the terms of the Purchase Agreements and LLC Agreements, investors in the Investment Funds made payments to DC Solutions for the Generators in installments after receiving proof that the Generators had been placed in service as evidenced by the delivery of the "IE Certificate." The LLC Agreements defined "IE Certificate" as "a certificate to be issued by the Independent Engineer" with respect to the Generators "upon achievement of Placement in Service."

51.     Beginning in 2014, the LLC Agreements stated that "'Independent Engineer' means Joseph Bayliss of Bayliss Innovative Services." Most Sale-Leaseback Contract investors also received these IE Certificates from Bayliss for the new Generators they purchased. Defendant Jeff Carpoff arranged for Bayliss and his

firm to serve as the "Independent Engineer."  This arrangement deceived investors as Bayliss was neither independent nor an engineer.  Bayliss holds general contractor and electrical licenses from the State of California, but he was never a licensed engineer.  And, Bayliss has known the Carpoffs since high school.  In fact, DC Solar hired Bayliss to perform various projects for the DC Solar and other businesses owned by the Carpoffs.

52.     Bayliss executed IE Certificates, titled "IE Commissioning Reports," for nearly all of the 16,400 Generators that Investment Funds and Sale-Leaseback Contract investors purchased from 2014 through 2018.  The IE Commissioning Reports contained a checklist of tests that Bayliss would complete in order to attest "that the system was installed in accordance with professional engineering practices and safety requirements; and that the system is ready and able to be used for the production of electricity."  For the overwhelming majority of these Generators, Bayliss signed IE Commissioning Reports without inspecting them, and without any basis for making the representations contained in the reports.  These representations were false because DC Solutions only had manufactured a small fraction of the Generators that it had purportedly sold to investors.  Indeed, of the over 16,400 Generators for which Bayliss provided IE Commissioning Reports, more than 11,400 could not be located.

53.     Jeff Carpoff knew that the statements in the IE Commissioning Reports signed by Bayliss were false because DC Solutions had not manufactured the thousands of Generators certified by Bayliss.  Even in instances where DC Solutions had manufactured some of the Generators, Jeff Carpoff knew that Bayliss had not inspected them because he had convinced Bayliss to simply sign reports by falsely representing that DC Solar employees would inspect the Generators.  Even after Bayliss learned that DC Solutions was not actually manufacturing the Generators, Jeff Carpoff was still able to persuade Bayliss to continue to "rubber stamp" the IE Commissioning Reports.

54.     Jeff Carpoff also knew that the deceptive IE Commissioning Reports Bayliss signed were being sent to investors and were important to them.  Indeed, Jeff Carpoff was copied on emails in which false IE Commissioning Reports were sent to investors and their representatives.  And, on at least one occasion, Jeff Carpoff himself sent deceptive IE Commissioning Reports containing Bayliss' deceitful certifications to a broker to be passed along to an investor.  Jeff Carpoff also knew that under the terms of the Investment Fund Contracts, including the Purchase Agreements he signed on behalf of DC Solutions, investors' capital contributions and payments to DC Solutions for the Generators were contingent on their receipt of the IE Commissioning Reports.

55.     Likewise, Paulette Carpoff knew that the statements in the IE Commissioning Reports signed by Bayliss were false.  Paulette Carpoff took part in conversations with Bayliss and Jeff Carpoff about the fact that DC Solutions had not manufactured Generators for which he signed reports.

56.     Paulette Carpoff also knew that the deceptive IE Commissioning Reports signed by Bayliss were being provided to investors and were material to them.  She sent IE Commissioning Reports for certain Investment Funds and at least one Sale-Leaseback Contract investor by email for Bayliss to sign.

### c.     *Jeff Carpoff Deceived Investors through the Manipulation of VINs and the Movement of Generators*

57.     At times, DC Solutions sold the same Generator to different Investment Funds or Sale-Leaseback Contract investors.  Investors were unaware that their supposed Generators were being resold, or that they were purchasing used Generators owned by someone else.   As part of these efforts, on occasions in 2017 and 2018, Jeff Carpoff participated (and supervised other DC Solar employees and Bayliss) in removing the VIN stickers from Generators assigned to certain Investment Funds or Sale-Leaseback Contract investors and replacing them with new VIN stickers assigned to other Investment Funds or Sale-Leaseback Contract investors.  Jeff

1  Carpoff orchestrated this effort in order to dupe investors during inspections into

2  believing that the Generators sold to them existed and/or could be found at the

3  locations DC Solar had asserted.  In certain instances, at Jeff Carpoff's direction, DC

4  Solar employees buried GPS devices purportedly attached to Generators at certain

5  locations to make it appear that the Generators were in use at those locations.

6      58.    In 2018, Jeff Carpoff also deceived inspectors associated with a Sale-

7  Leaseback Contract investor about the location of Generators that an investor had

8  purchased.  In preparation for a scheduled inspection of some of the Generators

9  purportedly owned by that investor, Jeff Carpoff and another DC Solar employee

10  developed a list of inspection sites and coordinated the delivery of Generators to

11  those sites before and on the day of the inspection.  This effort was intended to

12  deceive the inspectors as the Generators were neither leased nor in use at the

13  locations to which they were delivered.

14      **(2)**    **The Carpoffs Hid the Lack of Legitimate Lease Revenue**

15      59.    Lease revenue from end-users of the Generators was critical to the

16  success of the investments because it was the source of the funds that DC Distribution

17  needed to make lease payments to the Investment Funds and Sale-Leaseback Contract

18  investors.  Although DC Distribution purported to be earning millions each month in

19  legitimate lease revenue from end-users of the Generators, bank records prove that

20  DC Distribution generated minimal lease revenue from sub-leases to end-users.  In

21  fact, the vast majority of funds flowing into DC Distribution's bank accounts

22  consisted of transfers of investor funds from DC Solutions.

23      60.    For example, during the period of January 2013 through December

24  2018, a total of about $409,930,000 was deposited into DC Distribution's bank

25  accounts.  Of that amount, approximately $383,347,000 -- or 93.5% -- consisted of

26  transfers from DC Solution's bank accounts.  And, another $8,268,000 -- or 2.0% --

27  consisted of transfers from the bank accounts of different Investment Funds.  At

28  most, $18,316,000 -- or 4.5% -- of the deposits to DC Distribution's bank accounts

during the time period represented sub-lease payments from legitimate end-users of the Generators.

61.     But, during this period, DC Distribution paid about $347,800,000 to various Investment Funds and Sale-Leaseback Contract investors, most of which took the form of "lease payments" owed under the operative Equipment Lease Agreements.  Accordingly, DC Distribution's payments were not funded by legitimate sub-lease revenue, but instead by investor funds cycled through DC Solutions.

### a.     *Fraudulent Transfers*

62.     The Carpoffs oversaw this circular movement of funds between the accounts of the companies they owned and the Investment Funds, which started in the very early years of DC Solar because DC Distribution never generated enough lease revenue to satisfy its obligations to the Investment Funds or Sale-Leaseback Contract investors.  Roach was involved in the early transfers of funds between DC Solutions and DC Distribution and was part of communications with employees of DC Solutions, including Jeff and Paulette Carpoff, about the amounts that needed to be transferred so that DC Distribution could make its lease payments to the Investment Funds.  During that period, Roach or Paulette Carpoff (or another DC Solar employee working at her direction) would then execute the necessary transfers.

63.     In approximately August 2014, the Carpoffs hired Karmann as the Controller of DC Solutions and began to use him as the primary employee involved in the fraudulent transfers.  While Karmann did not have the ability to initiate bank transfers himself when he first started at DC Solutions, he calculated the amounts that were owed by DC Distribution to the Investment Funds each month and the amounts owed by the Investment Funds to DC Solutions under the terms of the Promissory Notes.  He also calculated the amount that needed to be transferred from DC Solutions to DC Distribution each month so that DC Distribution could make the lease payments owed to the Investment Funds and created spreadsheets that specified

the exact amounts that needed to be transferred among the various entities and in what order.  After making these calculations, Karmann provided the information directly to Paulette Carpoff (and/or other DC Solar employees working at her direction) who would then make the transfers.

64.     In early 2015, the Carpoffs granted Karmann the ability to initiate transfers between the bank accounts of DC Solutions, DC Distribution, and the Investment Funds himself.  Karmann continued DC Solar's practice of making monthly calculations and then regular transfers between the bank accounts of DC Solutions, DC Distribution and the Investment Funds from early 2015 through the end of 2018 with the knowledge and approval of the Carpoffs.

65.     The transfers of money were made by the Carpoffs and others working at their direction in order to perpetuate DC Solar's fraudulent scheme and to give the false appearance to investors that DC Distribution was generating sufficient lease revenue from end-users of the Generators in order for the investments to be profitable.  As the owners and officers of the companies, Jeff and Paulette Carpoff each had complete access to the bank accounts and the accounting records maintained in QuickBooks of both DC Solutions and DC Distribution.  Both Jeff and Paulette Carpoff knew DC Distribution was earning minimal lease revenue from genuine end-users of the Generators.  Each of them also knew that DC Solutions was subsidizing DC Distribution each month, mostly using investor funds, so that DC Distribution could make the lease payments due to the Investment Funds and Sale-Leaseback Contract investors.  And, each of them knew that investors were not informed of this arrangement.  Their actions kept the scheme running as new and existing investors purchased additional Investment Fund Contracts or Sale-Leaseback Contracts during the years the Carpoffs orchestrated the cycling of money through the various accounts.

### b.     *False Financial Statements*

66.     Prospective investors routinely requested financial statements from DC

Distribution and DC Solutions before investing.  The Carpoffs arranged for and authorized the preparation of false financial statements in order to cover up the fact that DC Solutions was subsidizing DC Distribution with investor money.  On or about June 2012, Jeff Carpoff and Roach, among others, met and discussed falsely categorizing the transfers from DC Solutions to DC Distribution as cost of goods sold.  Subsequently, at various points throughout the scheme, Roach issued "Accountants' Compilation Reports" accompanying financial statements for DC Distribution and DC Solutions covering various periods between 2011 through July 2018 and an audit firm issued "Independent Auditor's Reports" accompanied by financial statements for DC Solutions for each year from 2012 through 2017.  The financial statements accompanying these reports contained false and misleading information.

67.    The income statements for DC Distribution accompanying the compilation reports falsely stated that DC Distribution generated hundreds of millions of dollars of revenues in "Rental Income."  In reality, the overwhelming majority of the purported "Rental Income" consisted of intercompany transfers between DC Solutions and DC Distribution.  The income statements were intended to mislead investors and potential investors into believing that DC Distribution earned hundreds of millions of dollars in "Rental Income" from end-users of the Generators.

68.    Similarly, the financial statements in the various compilation reports and independent auditor's reports for DC Solutions also contained false information.  The cash infusions of hundreds of millions of dollars from DC Solutions to DC Distribution were hidden in the "Direct Costs" category of DC Solution's income statements.  In reality, these payments had nothing to do with the costs of manufacturing the Generators.  DC Solutions categorized the payments in this manner to conceal from investors the fact that DC Solutions funded DC Distribution's "Rental Income."

69.    At various points throughout the scheme, Roach, Karmann and/or other

DC Solar employees, or individuals working on behalf of DC Solar, sent certain of the financial statements and the accompanying reports via email to investors, prospective investors, or brokers to be passed on to investors or prospective investors. Jeff Carpoff was regularly copied on such emails. Paulette Carpoff also was at times copied on emails sending certain of the financial statements to a bank at which DC Solar maintained accounts and to brokers to be passed on to prospective investors or an outside law firm working on transactions. As the owners and officers of the companies, the Carpoffs had access to the bank accounts and accounting records for DC Distribution and DC Solutions, and were fully aware that DC Distribution had very little actual lease revenue and that DC Solutions infused it with cash. The Carpoffs therefore knew that the various compiled and audited financial statements contained false information. They also knew that accurate information about DC Distribution's revenue was important to investors.

### c.  *Fraudulent Lease Arrangements*

70.     Jeff Carpoff devised a number of deceptive lease arrangements to fool investors into believing that DC Distribution was earning sufficient sub-lease revenue from end-users to support its lease obligations to investors. In meetings and calls with brokers and/or prospective investors, Jeff Carpoff falsely claimed that demand for Generators was huge and touted leasing relationships with various customers, including Telecom Company A, A Rentals, and Company K. He also arranged for copies of the lease agreements with Telecom Company A to be provided to certain investors. In addition, pitch-books sent to prospective investors provided case studies of the established leasing arrangements that DC Distribution purportedly had with various customers, including Telecom Company A, A Rentals, and Company K. A broker working on behalf of DC Solar prepared these misleading pitch-books, versions of which were reviewed by both Jeff and Paulette Carpoff at various points in time.

71.     In reality, the leasing relationships with those customers resulted in

minimal amounts of legitimate lease revenue.  Jeff Carpoff oversaw the fabrication of the lease agreements with Telecom Company A and paid individuals to have those documents fraudulently signed without Telecom Company A's authorization.  The actual amount of lease revenue paid by Telecom Company A was a small fraction of the amount it purportedly contracted to pay under the fraudulent lease agreements.

72.     And, while A Rentals and Company K had contracted to lease Generators, DC Solar entered into side arrangements with them under which DC Distribution would send them funds so that each entity could then make the lease payments it owed.  Paulette Carpoff took steps in furtherance of these fraudulent lease arrangements by executing or approving external wire transfers from DC Distribution's bank accounts to A Rentals and Company K.  These wire transfers provided A Rentals and Company K with the funds necessary to make their lease payments and appear as legitimate lessees.

73.    If the  investors who had  heard these pitches or received pitch-books knew the true circumstances surrounding the lease arrangements with Telecom Company A, A Rentals, and Company K, they would not have purchased investment contracts from DC Solar.

### (3)    The Carpoffs Misappropriated Investor Funds

74.     Rather than using investor funds to manufacture the Generators that investors purchased, the Carpoff used a large portion of the money that flowed into DC Solar to run their Ponzi scheme and support their lavish lifestyle.  From January 2013 through December 2018, the Carpoffs took at least $140 million for their personal benefit.  They purchased at least 150 cars, dozens of properties, including business properties, luxury personal properties, and vacation homes, and a share in a private jet service.  Jeff and Paulette Carpoff also transferred tens of millions of dollars to their joint and individual bank accounts, as well as the bank accounts of other companies they owned.

75.     On December 18, 2018, federal law enforcement agents executed federal

seizure warrants on nearly all of the bank accounts associated with DC Solar, including bank accounts of the Investment Funds.  As an additional Investment Fund had closed around or after the time of the approval of the warrants, a bank account associated with that latest Investment Fund was not seized.  On December 19, 2018, Paulette Carpoff, consistent with the Carpoffs' fraudulent practice of treating investor funds as their own, exploited this situation and wired $5 million from the bank account of this Investment Fund to a bank account in South Carolina associated with a law firm that specializes in asset protection.  Paulette Carpoff did not have the permission of the investor to take the money, which came from capital contributions that the investor paid pursuant to the LLC Agreement and was supposed to be used to pay for Generators under the terms of the Purchase Agreement.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection With the Sale of Securities
Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Thereunder
(Against All Defendants)**

76.    The SEC realleges and incorporates by reference paragraphs 1 through 75 above.

77.    Defendants Jeffrey and Paulette Carpoff, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      a.    employed devices, schemes, or artifices to defraud;

      b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.    engaged in acts, practices, or courses of business which operated

or would operate as a fraud or deceit upon other persons.

78. By engaging in the conduct described above, Defendants Jeffrey and Paulette Carpoff violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer and Sale of Securities
### Violations of Sections 17(a) of the Securities Act
### (Against All Defendants)

79. The SEC realleges and incorporates by reference paragraphs 1 through 75 above.

80. Defendants Jeffrey and Paulette Carpoff, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      a.    with scienter, employed devices, schemes, or artifices to defraud;

      b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

81. By engaging in the conduct described above, Defendants Jeffrey and Paulette Carpoff violated, and unless restrained and enjoined will continue to violate, Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Upon motion of the Commission, order Defendants to disgorge all ill-gotten gains they received, together with prejudgment interest thereon.

### III.

Upon motion of the Commission, order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  January 24, 2020

/s/ Dean M. Conway
_____
Dean M. Conway
Sarra Cho
Christopher Nee
Attorneys for Plaintiff
Securities and Exchange Commission